IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAVIER ANGULO, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 22 C 923 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| TRUIST BANK d/b/a Sheffield Financial, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Javier Angulo, Jr. alleges Defendant Truist Bank, doing business as Sheffield Financial ("Sheffield") willfully and negligently violated the Fair Credit Reporting Act by failing to conduct a reasonable investigation of inaccurate credit information reported to Equifax Information Services, LLC. (Dkt. 1). Sheffield moves for judgment on the pleadings, arguing Angulo's claims fail because his Equifax credit report is accurate. (Dkt. 17). For the following reasons, the Court finds Angulo lacks standing to bring his claims as pleaded and grants Sheffield's motion and dismisses Angulo's complaint without prejudice, with leave to amend.

**BACKGROUND**

Angulo had a credit account at Truist Bank, known as Sheffield Financial. (Dkt. 1 ¶ 11). He paid off the account in full on January 1, 2020, and closed it. (Dkt. 1 ¶¶ 13–14). Nevertheless, Sheffield reported the closed account's payment status as "30 days past due" to Equifax Information Systems, LLC,[1] a consumer credit reporting agency. (*Id.* ¶ 12; *id.* ¶ 6). Equifax published a report on Angulo's credit history (the "credit report"). (Dkt. 13-1).

---

[1] Plaintiff settled his dispute with Equifax, which is no longer a defendant in this action. (Dkt. 12; Dkt. 21).

1

The credit report shows Angulo's Sheffield account as closed, with an Account Status as "NOT_MORE_THAN_TWO_PAYMENTS_PAST_DUE," a $0.00 balance, and 0% debt-to-credit ratio. (*Id.* at 42–43). The report then provides a Payment History with monthly notations indicating whether payment was made on time or late. (*Id.* at 42). The payment history starts September 2017 and ends December 2019. (*Id.*) Of this 28-month history, the account was current except for March 2019, July 2019, and December 2019, which all have a "30" notation, indicating the account was "30 Days Past Due" that month. (*Id.*)

Around June 4, 2021, Angulo notified Equifax that he disputed the Sheffield account information's accuracy on his credit report, and Equifax informed Sheffield of the dispute. (Dkt. 1 ¶¶ 19–20). But Sheffield "failed to conduct a reasonable investigation" of the reported inaccuracies, made no changes, and continues to publish and disseminate the information. (*Id.* ¶¶ 21–22; 26; 48). According to Angulo, the information furnished by Sheffield and reported by Equifax is inaccurate because the pay status field "is specifically designed to be understood as the current status of the account." (*Id.* ¶ 16). Further, "credit scoring algorithms take this data field into account when generating a credit score, and when it is showing this negative status, it would cause a lower credit score to be generated than a closed status," and creditors make lending decisions based on automatically generated scores. (*Id.* ¶¶ 16–17) As a result of Sheffield's conduct, Angulo claims he suffered concrete harm in the form of "loss of credit, loss of ability to purchase and benefit from credit, a chilling effect on applications for future credit, and the mental and emotional pain, anguish, humiliation, and embarrassment of credit denial." (*Id.* ¶¶ 27; 49; 61).

Angulo argues Sheffield willfully and negligently violated the Fair Credit Reporting Act (FCRA) by failing to conduct, upon notice of a dispute, a reasonable investigation of reported inaccuracies on his consumer credit report and to correct inaccurate information furnished to

2

Equifax. (*Id.* ¶¶ 43–51; 53–62); 15 U.S.C. § 1681s-2. Sheffield answered Angulo's Complaint and moved for judgment on the pleadings because information reported on the Equifax credit report about Angulo's Sheffield account is accurate. (Dkt. 13; dkt. 17 at 1–3).

## LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A Rule 12(c) motion for judgment on the pleadings is governed by the same standard as a Rule 12(b)(6) motion to dismiss. *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir. 2014). To survive a motion for judgment on the pleadings—just as for a motion to dismiss—"a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In ruling on a Rule 12(c) motion, the Court considers the pleadings, including the complaint and answer, and may also consider documents incorporated by reference to the pleadings and matters properly subject to judicial notice. *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 640 (7th Cir. 2017). "As with a motion to dismiss, the court views all facts and inferences in the light most favorable to the non-moving party." *Federated Mut. Ins. Co. v. Coyle Mech. Supply, Inc.*, 983 F.3d 307, 313 (7th Cir. 2020).

## DISCUSSION

"Standing is a threshold question in every federal case because if the litigants do not have standing to raise their claims the court is without authority to consider the merits of the action." *Meyers v. Nicolet Restaurant of De Pere, LLC*, 843 F.3d 724, 726 (7th Cir. 2016) (quoting *Freedom From Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1467 (7th Cir. 1988)). Although neither party has raised Article III standing, the Court addresses this jurisdictional issue sua sponte,

to fulfill its "independent duty to ensure that this case is properly in federal court." *Cothron v. White Castle Sys., Inc.*, 20 F.4th 1156, 1160 (7th Cir. 2021) (internal quotation and citation omitted); *see also id.* at 1159–60 (affirming district judge's sua sponte consideration of injury-in-fact element of Article III standing).

To have standing, a plaintiff first "must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations omitted). Next, the plaintiff must show how the defendant's conduct caused his injury. *Lujan*, 504 U.S. at 560 ("[T]he injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." (cleaned up)). Finally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)).

The plaintiff must support each element of standing to sue "with the same manner and degree of evidence required at the successive stages of the litigation." *Id.* "At the pleading stage, the plaintiff must allege facts that demonstrate each element of Article III standing." *Crabtree v. Experian Info. Sols., Inc.*, 948 F.3d 872, 877 (7th Cir. 2020).

The standing inquiry begins—and ends—with Angulo's allegations he suffered an injury in fact from Sheffield's FCRA violation of the Fair Credit Reporting Act. "Identifying a violation of a statutory right does not automatically equate to showing injury-in-fact for standing purposes." *Crabtree*, 948 F.3d at 877 (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016)). Angulo's alleged injury is particularized because it relates to his personal credit history, but he must also have alleged concrete harms to establish an injury in fact. *See id.* (explaining *Spokeo, Inc.*, 578

4

U.S. at 340–343). Not all harms are legally cognizable. To be "concrete," the harm Congress sought to prevent in enacting a statute must bear "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (quoting *Spokeo, Inc.*, 578 U.S. at 341). This includes traditional pecuniary harms as well as "[v]arious intangible harms," such as "reputational harms." *TransUnion LLC*, 141 S. Ct. at 2204. Furthermore, "[a] plaintiff seeking money damages has standing to sue in federal court only for harms that have in fact materialized," rather than alleged future harms. *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 938 (7th Cir. 2022) (citing *TransUnion LLC*, 141 S. Ct. at 2210–11).

Angulo alleges he suffered concrete harm in the form of (1) loss of credit, (2) loss of ability to purchase and benefit from credit, (3) humiliation and embarrassment of credit denial, (4) a chilling effect on applications for future credit, and (5) the mental and emotional pain and anguish of credit denial. (Dkt. 1 ¶¶ 27, 49, 61). Some of these harms—if properly supported by factual allegations—are sufficiently concrete to confer standing. These are: loss of credit, loss of ability to purchase and benefit from credit, and humiliation and embarrassment of credit denial.

First, loss of credit involves a pecuniary harm. *See Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001) (noting that if plaintiff could show causal relation between FCRA violation and loss of credit, he could sustain monetary damages award); *see also Persinger v. Southwest Credit Sys., L.P.*, 20 F.4th 1184, 1194 (7th Cir. 2021) (recognizing loss of credit as pecuniary harm). A person suffers harm by paying a higher interest rate on a loan than he otherwise would have due to an FCRA violation. Likewise, loss of ability to purchase and benefit from credit (i.e., credit denial) represents a tangible pecuniary harm. A person who is denied credit altogether likely cannot make major purchases such as a home or car. This is, indeed, at the core of what the

5

FCRA seeks to protect: a consumer's participation in the credit market based on fairly and accurately reported credit information. *See* 15 U.S.C. § 1681(b).

But critically, Angulo has not supported his legal conclusion that he experienced concrete harm with the requisite factual allegations about a loss of credit or a credit denial. His complaint goes no further than the conclusory statements above. At the pleading stage, a plaintiff must provide "more than labels and conclusions" or "a formulaic recitation of the elements." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint is insufficient "if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation and citation omitted). For Angulo to have standing to sue, he must allege facts showing he experienced the concrete harm of loss of credit or a credit denial, rather than offering only this bare assertion. *See Crabtree*, 948 F.3d at 877. Even had he done so, he would still bear the burden of pleading facts supporting a plausible inference that Sheffield's conduct—rather than some other factor—caused this injury, the second element of Article III standing to sue. *See Lujan*, 504 U.S. at 560.

The intangible humiliation and embarrassment of credit denial may also be considered a concrete injury in the FCRA context. In passing the FCRA, Congress found, "[t]he banking system is dependent upon fair and accurate credit reporting," and "[a]n elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." 15 U.S.C. § 1681(a)(1)–(2). Congress recognized that a person's credit history bears on his character, and that disseminating inaccurate or misleading credit information injures a person's reputation. Humiliation and embarrassment result from this loss of reputation. This injury therefore bears a close relationship to defamation, a long-recognized reputational harm. *See TransUnion LLC*, 141 S. Ct. at 2208–09 (finding concrete harm

6

in dissemination of credit reports with false-positive OFAC alerts because injury was analogous to defamatory statements that "would subject [a person] to hatred, contempt, or ridicule" when published) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13, (1990)).

Again, however, Angulo failed to support alleged reputational harm and his resulting humiliation and embarrassment with any specific factual allegations. "It is not enough to say that your reputation was harmed without explaining how." *Crabtree*, 948 F.3d at 880. As discussed, Angulo never alleged any specific instance of credit denial, let allow how he experienced reputational harm from it. Without more, Angulo's bare allegation of "humiliation and embarrassment of credit denial" is too "conjectural or hypothetical" to establish standing. *See Crabtree*, 948 F.3d at 880 (explaining that allegations of reputational injury in the FCRA context must be supported by specific facts).

In contrast, "mental and emotional pain [and] anguish" from credit denial is not an injury that the FCRA vindicates. While damages for emotional distress may flow from an FCRA violation with a proper causal connection, *see Persinger*, 20 F.4th at 1194 (collecting cases), the analysis of this intangible harm's concreteness to confer standing is distinct. Intentional infliction of emotional distress is a "traditional" basis for American lawsuits. *See, e.g.*, Restatement (Second) of Torts § 46 (Am. L. Inst. 1965). But there is no evidence Congress enacted the FCRA to protect consumers from the emotional distress of inaccurate credit reports. The statute vindicates a consumer's interest in "fair and accurate credit reporting," and it seeks to structure credit reporting "in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information . . . ." 15 U.S.C. § 1681(a)–(b). But the statute is not designed to prevent a consumer from experiencing mental and emotional distress, even if inaccurate credit reporting may have that ancillary effect on a consumer. *Cf. Pierre*, 29 F.4th at

7

939 (holding that "worry . . . is insufficient to confer standing" in related context of Fair Debt Collection Practices Act violation). Even if Angulo were to succeed on the merits of his claims and prove Sheffield's FCRA violation caused him actual damages for emotional distress, he has no standing to sue on this basis alone. Emotional distress is not a concrete injury the FCRA sought to protect consumers from, so it cannot be an injury in fact for standing purposes.

Finally, "a chilling effect on applications for future credit" is not a concrete harm sufficient to confer standing in a suit for money damages. "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion*, 141 S. Ct. at 2210. Suits for money damages, in contrast, recognize as concrete "harms that have in fact materialized." *Pierre*, 29 F.4th at 938 (citing *TransUnion*, 141 S. Ct. at 2210–11). An inaccurate credit report could plausibly cause a pecuniary harm to Angulo in the future *if* he applies for credit. But this does not confer standing to collect money damages *now* for harm that has not yet happened.[2]

In sum, Angulo's complaint currently lacks factual allegations showing he plausibly suffered an injury from Sheffield's alleged FCRA violation, so his claims lack standing. His alleged harms are either not concrete, or nothing more than bare, conclusory assertions of suffering. The Court cannot proceed to the merits of Angulo's FCRA claims without sufficient facts to support each element of his standing to sue Sheffield for the alleged violation. If such facts exist, Angulo may amend his complaint and plead facts that show he has plausibly suffered (1) a concrete and particularized injury, (2) that Sheffield caused, and (3) the Court can remedy.

---

[2] Angulo has not asked this Court for injunctive relief against Sheffield to correct his credit information. He has requested only actual damages, statutory damages, punitive damages, and attorney fees and costs for the on-going FCRA violation. (Dkt. 1 at 12).

**CONCLUSION**

Because the Court lacks standing—a threshold jurisdictional issue—to address the merits of Angulo's FCRA claims, the Court grants Sheffield's Motion for Judgment on the Pleadings [17]. The Complaint is dismissed without prejudice, and the Court grants Angulo 30 days to amend, after which the dismissal shall convert to dismissal with prejudice.

```
_____
Virginia M. Kendall
United States District Judge
```

Date: October 25, 2022